Filed 11/24/20  In re K.M. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re K.M., et al., Persons Coming Under Juvenile Court Law. | B304516 |
| ——————————————— LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. Nos. 19CCJP07128, 19CCJP07128A, 19CCJP07128B) |
| Plaintiff and Respondent, | |
| v. | |
| L.F., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Victor G. Viramontes, judge.  Affirmed.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

Mother appeals from the jurisdictional findings and disposition orders declaring her children dependents of the juvenile court after the court sustained a petition pursuant to Welfare and Institutions Code section 300, subdivision (b).[1] She argues there was insufficient evidence to support jurisdiction based on her failure to protect the children from father's substance abuse. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has two children, daughter (born 2011) and son (born 2014) by different fathers. At the inception of this dependency case, mother and the children resided with son's father, son's paternal grandparents, and son's paternal 14-year-old aunt. For convenience and clarity, we refer to son's father as "father."

Daughter was dependent of the juvenile court from 2012 to 2013 due to her father, D.M.'s domestic violence and substance abuse issues. Dependency jurisdiction in that matter was eventually terminated with mother having sole custody of daughter. D.M. received monitored visitation.

### 1.    *DCFS Involvement and Initial Safety Plan*

On October 3, 2019, DCFS received a child abuse referral after father was seen slapping and yelling at five-year-old son when dropping him and eight-year-old daughter off at school. The reporting party observed a mark on son's face and smelled marijuana emanating from father's car as the children exited. DCFS interviewed an aid at the school who assisted with the school valet program in the mornings. She confirmed that she, other staff, and parents witnessed father hit son on the face with

---

[1]    All subsequent statutory references are to the Welfare and Institutions Code.

an open hand. Son had a red mark on his cheek from the slap. The aid expressed concern that father's car regularly smelled liked marijuana when he dropped the children off at school. She never witnessed anyone smoking in the car but noted the marijuana odor was "very strong."

DCFS interviewed the family on October 8, 2019. Both children confirmed father hit son at drop off. The children were unfamiliar with marijuana and had not witnessed father smoke anything. The children stated father drove them to school daily.

Mother admitted that she was aware of father's daily use of marijuana. Mother described the family's daily routine: father drove mother to work between 4:00 a.m. and 4:30 a.m., he smoked marijuana around 6:00 a.m. to manage his foot and back pain, and he then drove the children to school at 7:30 a.m. She stated father sometimes picks the children up after school and transports them home. Mother reported that father "carries it [marijuana] with him at all times and will leave it in the car when he is home."

Mother dismissed DCFS's concerns about father driving the children under the influence of marijuana and expressed her belief that father was sober by the time he transported the children to school. Mother reported father rarely drank alcohol and never used other substances. Mother eventually agreed to a safety plan where she would no longer allow father to smoke marijuana in the mornings prior to transporting the children to school.

Father admitted to hitting son in the face with an open hand, stating, " 'I did hit him; he was crying like a little girl.' " Father said he hit son as punishment for calling father a " 'bitch,' " said it was an isolated incident, and acknowledged that his reaction was inappropriate.

3

When DCFS expressed concern about father's marijuana abuse, father provided DCFS with a copy of his medical marijuana card. Father obtained the medical marijuana recommendation on August 6, 2019; it was set to expire on August 4, 2020. The statement from the physician indicated that father was informed "not to drive, operate heavy machinery or engage in any activity that requires alertness while using medical marijuana." Father said he was pulled over earlier in the year, arrested for possession of marijuana for sale, and ordered to complete a drug treatment program.

Father explained he used marijuana for the past two to three years to manage back and foot pain. He kept the marijuana stored inside a backpack that he left in the car. Father admitted he smoked marijuana in the parking lot outside the family home in the mornings around 6:00 a.m. prior to driving the children to school. Father stated he sobered up before transporting the children, explaining, " 'I don't get stupid high in the morning, just enough to stop the pain.' " Father denied using any other drugs. When DCFS pressed the point that father transported the children while under the influence of marijuana, father agreed to refrain from smoking it in the mornings until after he dropped off the children and to submit to on-demand drug testing.

Mother and father stated they understood the DCFS safety concerns and agreed to a safety plan that included drug testing and not smoking marijuana before transporting the children in a car.

## 2. Second Safety Plan

On October 11, 2019, three days after the parents signed the first safety plan, father tested positive for methamphetamine, amphetamine, and marijuana. Father adamantly denied ever using methamphetamine. He said he shared drug paraphernalia

4

with his friends, and blamed his positive methamphetamine test on his use of a dirty drug pipe.[2] Mother stated she was unaware of father's methamphetamine use. She noted that D.M. (daughter's father) used drugs and she was able to notice a difference in his behavior, but she did not observe such changes in father.

The parents agreed to additional safety measures, including having father move out of the family home for seven days while DCFS further investigated his substance abuse.

On October 23, 2019, father tested positive for marijuana but not methamphetamine. On October 28, 2019, DCFS sought a warrant to remove son from father's care. On October 29, 2019, DCFS contacted mother and requested that the safety plan be extended for an additional seven days. Mother refused, stating the plan had been difficult on the family, and father had to sleep in his car due to being homeless. Mother said father was the main provider for the family, but she needed him to transport the children to school and her to work. She did not believe that father had done anything to harm the children.

Father also refused to extend the safety plan, claiming the most recent drug test proved he was not a methamphetamine addict. He planned to move back into the family home and said he would only move out pursuant to a court order. Father promised that he would only smoke marijuana at night and refrain from driving the children to school after smoking marijuana.

---

[2]     DCFS found that father's methamphetamine levels were high and his story was not plausible.

5

### 3. *Removal Order, and Section 300 Petition*

On October 30, 2019, the court issued the warrant to remove son from father's custody.[3] On October 31, 2019, DCFS informed mother of the removal order. Mother reasserted that father was not a methamphetamine addict, nor did he use methamphetamine on a regular basis, and his clean test proved he was not a drug addict. When DCFS informed mother that father's visits had to be monitored, she expressed disagreement. Mother stated father did nothing wrong, deemed DCFS and court intervention " 'unnecessary,' " and wanted father back inside the family home.

On November 4, 2019, DCFS filed a petition alleging the children came within the provisions of section 300, subdivision (b)(1). The petition alleged that father's history of and current substance abuse endangered the children, and mother failed to protect the children from father's substance abuse, allowing him to reside in the family home with unlimited access to them.

On November 5, 2019, the juvenile court found father to be the presumed father of son, and D.M. to be the presumed father of daughter. DCFS sought detention from parental care. The juvenile court detained the children from, respectively, father and D.M. The court released the children to mother under the following conditions: (1) father was to reside outside the family home; (2) father was not to transport the children in a car; (3) mother was not to monitor father's visits with the children; (4) mother was to participate in family preservation services, ALANON meetings, and individual counseling; and (5) mother

---

[3] The court did not issue a removal order for daughter because father was not her parent.

6

was to cooperate with DCFS's unannounced home visits to check on the safety of the children.[4]

### 4.    *Post Detention Investigation*

Following son's removal from father's care, father moved out of the family home and into the home of the paternal great-grandparents.  On January 9, 2020, father was re-interviewed at a DCFS office.  In a report filed with juvenile court, the social worker noticed that father smelled of marijuana and appeared to be under the influence of drugs.  When confronted, father admitted to smoking marijuana prior to the 11:00 a.m. interview.  He also admitted that he drove his car to the interview.  Father said he drank four beers the previous day.  DCFS asked and father agreed to submit to an on-demand drug test that day, but later that day, he falsely claimed the drug testing location was closed.  Father submitted to a drug test the following day, testing positive for methamphetamine, amphetamine, and marijuana.

Regarding his marijuana use, father stated he started smoking marijuana at age 19 (he was then 27 years old) and began smoking marijuana daily about four years ago after twisting his ankle at work.  Father noted he smoked marijuana three times a day, totaling 3.5 grams and costing him between $20 and $30 per day.  He always smoked marijuana in the mornings and took a two-hour nap before driving the children to school.  He claimed he never felt " 'under the influence' " while transporting the children to school.

Father told DCFS that he did not want to stop smoking marijuana.  He stated, " 'I don't like feeling in my five senses.  I have been smoking so long and I feel happy when I smoke.  I have tried to quit for like 2 or 3 days in the past and I don't like

---

[4]    The juvenile court ordered no services for D.M. whose whereabouts were unknown.  D.M. is not a party to this appeal.

how I feel. I get grumpy and stressed. I have tried reducing right now. I'm only smoking once per day because I want to go back with my kids.' "

Father minimized his arrest for possession of marijuana with intent to sell, stating that he purchased one pound of marijuana for personal use. Father was in the process of completing a criminal court drug diversion program.

Father also admitted he consumed alcohol weekly, stating "I drink about 6 beers on Saturdays but I don't get drunk." Father denied methamphetamine use, claiming he "only sniffed meth two times" when he was 16 years old. Father believed he tested positive for methamphetamine because he used his friend's "dirty pipe" while smoking marijuana at work. According to father, he was aware his friend smoked methamphetamine, and during the six days leading up to his positive methamphetamine test, father had used his friend's methamphetamine drug pipe at work to smoke marijuana.

DCFS attached to its report father's drug test results that showed a positive test for methamphetamine, amphetamine, and marijuana on October 11, 2019; tested positive for marijuana on October 23, 2019; failed to show on January 9, 2020; and tested positive for methamphetamine, amphetamine, and marijuana on January 10, 2020.

### 5.     *Jurisdiction/Disposition Hearing*

The combined jurisdiction/disposition hearing took place on January 29, 2020. Mother appeared at the hearing; father did not. The court received into evidence various DCFS reports with attachments. Mother also submitted an enrollment letter from her individual counseling program.

Counsel for DCFS, joined by counsel for the children, requested the petition be sustained as pled. Counsel for mother, joined by counsel for father, asked the court to dismiss the section

300 petition and impose informal supervision under section 360, subdivision (b).

The juvenile court sustained the petition as pled, finding father's substance abuse issues and mother's failure to protect placed the children at substantial risk of serious physical harm pursuant to section 300, subdivision (b)(1).  The juvenile court expressed concern about father's drug abuse, the storage of the marijuana inside a backpack in the car used to transport the children to school, and mother's knowledge that father transported the children shortly after smoking marijuana.

The juvenile court sustained the petition as follows:

"(b-1):  The children['s] mother['s] male companion, [father], father of [son], has a history of substance abuse, and is a current abuser of amphetamine, methamphetamine and marijuana, which renders . . . father incapable of providing regular care for [son].  On 10/11/19 . . . father had a positive toxicology screen for amphetamine, methamphetamine, and marijuana.  On 10/23/19 . . . father had a positive toxicology screen for marijuana.  On prior occasions . . . father was under the influence of amphetamine, methamphetamine and marijuana while [son] was in the father's care and supervision.  The [son] is of such a young age, requiring constant care and supervision, and . . . father's substance abuse interferes with providing regular care and supervision of the child.  The mother failed to protect the children when she knew of . . . father's substance abuse.  The mother allowed . . . father to reside in the children's home and have unlimited access to the children.  [Father]'s substance abuse, and the mother's failure to protect the children, endangers

9

the children's physical health and safety, and places the children at risk of serious physical harm, damage and failure to protect."

After sustaining the petition, the juvenile court proceeded to disposition. It declared the children dependents of the court and ordered them removed from their respective fathers' care with monitored visitation. The children remained in mother's care, and she was ordered to participate in family maintenance services, including ALANON meetings and individual counseling services.

Mother timely appealed.

### *DISCUSSION*

Mother argues that there was insufficient evidence to support the court's jurisdictional finding that mother failed to protect the children from father's substance abuse, or that father was a substance abuser.

### 1.   *Applicable Law*

The juvenile court found the children dependent under section 300, subdivision (b)(1). That subdivision provides, in pertinent part, that a child may be declared dependent if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left. . . ." (§ 300, subd. (b)(1).) "A jurisdictional finding under section 300, subdivision (b)(1), requires [the agency] to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a

10

substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

In making its section 300, subdivision (b)(1) finding, the court applied section 355.1, which states: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300."

"We review the juvenile court's jurisdictional findings for sufficiency of the evidence. We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. However, substantial evidence is not synonymous with any evidence. . . . [W]hile substantial evidence may consist of inferences, such inferences must be a product of logic and reason and must rest on the evidence [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763 (internal quotation marks and citations omitted).)

**2.** ***Substantial Evidence Supports Jurisdiction***

As DCFS points out, mother claims she "does not challenge the adjudicatory findings" made against father, i.e. the findings that father's history of substance abuse and current abuse of methamphetamine and marijuana rendered him incapable of caring for son. Almost immediately, though, mother does an about face and argues that there "was no substantial evidence

11

father was a "substance abuser."[5] We treat her appeal as raising both issues.

We reject mother's argument that insufficient evidence supports the court's finding of substance abuse. Father habitually drove his children to school shortly after smoking marijuana. His car smelled strongly of marijuana, and he admittedly kept marijuana in his car and on his person at all times. Even after he promised to reduce his marijuana intake when DCFS became involved, he arrived at a meeting with DCFS under the influence and smelling of marijuana. He had driven to the meeting. On three occasions, father tested positive for marijuana, and on two occasions, for methamphetamine and amphetamine. Father was also arrested for possession with intent to sell marijuana (when he was found carrying a pound of it on his person) and was still in the process of completing a drug program at time of the jurisdiction hearing. Father did not want to stop his drug use. He told DCFS he did not like how he felt when off marijuana, and was grumpy and stressed when not using. Father was dependent on a drug that compromised his ability to parent and particularly endangered the children he regularly transported to and from school shortly after smoking it. Thus, there was substantial evidence of father's substance abuse. (See *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 726 [substance abuse can be shown with "evidence of life-impacting effects of drug use"]; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218-1219.)

---

[5] Mother's subheading for her argument is: "There was no substantial evidence [father] was a 'substance abuser' and therefore, the finding that mother 'failed to protect the children when she knew of [father's] substance abuse' should be reversed."

We also conclude substantial evidence supported the juvenile court's finding that mother failed to protect the children from father's substance abuse.  Mother was aware father smoked marijuana shortly before he drove the children to school.  Mother told DCFS father "will smoke at around 6:00 AM and takes the children to school at around 7:30 AM."  When asked by DCFS whether she had concerns about father driving under the influence with the children, mother responded that she was "not too concerned because she thinks by that time he is fine."  Mother, whose workday started around 4:30 a.m., did not explain how she knew that father was not under the influence when he drove the children to school.  Mother expressed disbelief when father tested positive for methamphetamine, denied he was a drug addict, later refused to make father move out of the family home unless there was a court order, and deemed juvenile court intervention " 'unnecessary.' "  The evidence supports the court's conclusion that mother knew of the substance abuse and allowed her children to be regularly exposed to it.

Mother asserts there "was no evidence [father] was the sole care provider for the children when he was under the influence of marijuana" or that father was under the influence of marijuana when he drove the children to school.  We disagree.  The undisputed evidence is that father (without accompaniment from another caregiver) drove the children to school an hour and a half after smoking marijuana.  The car smelled strongly of marijuana when he dropped off the children.  And on one occasion, father assaulted his five-year-old son by slapping him on the face, leaving a red mark.  Father also appeared to be under the influence of drugs at an 11:00 a.m. meeting at a DCFS office, and admitted to smoking before driving himself there.  The juvenile court could have reasonably concluded from this evidence that

father routinely drove the children under the influence of marijuana, placing them in danger.

Mother argues that by the time of the jurisdictional hearing, there was no risk of harm to the children because father had been living elsewhere for three months and mother was compliant with DCFS's requests and the court's orders. That the parents complied with court orders for three months does not undercut the substantial evidence that supported the juvenile court's finding of risk of harm. The "court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. The court may consider past events in deciding whether a child presently needs the court's protection. A parent's [p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1216 [citations and internal quotation marks omitted].)

### *DISPOSITION*

The court's jurisdictional finding and dispositional order are affirmed.


RUBIN, P. J.

WE CONCUR:



BAKER, J.



MOOR, J.


14